Thank you, your honor. May it please the court. My name is Carolyn Kubitschek. I am representing William Maner and I respectfully request five minutes for rebuttal. Okay. Mr. Maner submits that first, he was a victim of sex discrimination on the part of his former employer, Dignity Health, when his employer repeatedly provided employment benefits to the supervisor's female paramour, which were denied to Mr. Maner. Those benefits included crediting the paramour, and not Mr. Maner, with patents for inventions that Mr. Maner had developed and culminated in the discharge of Mr. Maner. Second, Mr. Maner claims that Dignity Health retaliated against him when he complained about the employer's actions, which he reasonably believed to constitute sex discrimination. On the issue of his discriminatory discharge, Mr. Maner asks this court to hold that sexual favoritism is sex discrimination when an employer who provides employment benefits and opportunities to a supervisor's sexual partner denies those same benefits to another qualified employee. Ms. Kubitschek, may I interrupt for a second? Suppose that Dr. She was a male and there was a sexual relationship between the supervisor and a male, would you still claim there was sexual discrimination? Yes, Your Honor, we would. And what you're claiming is that sex relations, not the particular sex of the benefited or prejudiced party, is meaning, in the 1964 Act, is within the meaning of sex. Is that correct? That is correct, Your Honor, and that is what the regulation… Because nine other circuits, except the Paramore Defense, if you want to call it that, do you have any authority at all for your position that sexual relations, not the particular sex or gender of either the benefited or the prejudiced party, is within the meaning of sex within the 1964 Act? Can you tell me that? Yes, Your Honor, the authority is from the regulation itself, which says when benefits are granted because of an individual's submission to the employer's sexual advances or request for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons. And it does not say other persons of the opposite sex. That's a hostile work environment type or quid pro quo type claim, right? And I don't think Mr. Maynard is claiming that he ever was asked for sexual acts. Correct, he was not asked for sexual acts, and the regulation itself does not restrict its coverage to people who were asked for sexual acts and refused. On the contrary, the regulation speaks of when one employee is involved in a relationship with a supervisor, a sexual relationship with a supervisor, and other employees are denied benefits because of that sexual relationship, that is sex discrimination, regardless of the gender of the other employees. Do we have any cases so holding? In one of our 28-J letters, we did cite to a district court case which so holds. And also, I would submit that the EEOC guidance from 1990 also so holds because it says that it talks specifically about paramours. That it says, isolated instance of favoritism toward a paramour does not discriminate, therefore implying, stating implicitly, that multiple instances of employment favoritism toward a paramour do constitute discrimination. So one strike is okay, but two strikes is bad? Correct, Your Honor. And three strikes, you're out. Your Honor, and in this case, what Mr. Mainer suffered over the years that he worked for Dignity Health was first, as I've said, the supervisor took his inventions and gave the patents to the female paramour. The supervisor gave opportunities for professional development to the female paramour by taking her to conferences on the company's pay that Mr. Mainer was denied. And ultimately, the company fired Mr. Mainer and retained the paramour. I'm trying to look for the language of that regulation that you read from earlier in your argument, and I'm not finding it in your brief. Is it in your brief somewhere that I could look at it? The regulation is in our 28-J letter, which was submitted on April 23rd. I believe it's stock at entry number 51. Is it a new regulation? Why was it only in a 28-J letter? Your Honor, I came on this case about one month ago, and I don't know why it was not cited, but the district court specifically mentioned it and said that the regulation did not apply because Mr. Mainer had not raised it properly in his pleadings, which we addressed in the 58-J letter. He did raise the regulation. And secondly, the EEOC guidance, which is discussed at length in the district court decision and in all of the briefs by counsel, the EEOC guideline is a guideline which purports to clarify that particular regulation so that the regulation itself is at the forefront of what we're discussing. We're discussing right here, right now. And with regard to the issue of sex discrimination versus possible gender discrimination, the Supreme Court of the United States addressed that squarely just last year in the case of Bostock against Clayton County, which again was discussed at length in the briefs. And it said, the court said, if I may quote, From the ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges. An employer violates Title VII when it intentionally fires an individual employee based in part on sex. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision, and it doesn't matter if the employer treated women as a group the same when compared to men as a group. And we submit that that is extremely important because by discharging Mr. Maynard and retaining the supervisor's paramour, Mr. Maynard's employer added a criterion for job retention that Mr. Maynard could not possibly satisfy, namely to be the sex partner of the supervisor. Mr. Maynard, a man, could not... I'm sorry? Did he propose to become the sex partner of a supervisor? Mr. Maynard did not propose to become the sex partner of the supervisor. Mr. Maynard did not think that sex is a job criterion for the job of an engineer, which is what he was hired for, and the job that he performed in a stellar capacity. So when the... Do you want to talk about retaliation? Sure. On the issue of retaliation, Mr. Maynard complained that when he learned that he was about to be fired or that his supervisor had recommended firing him and retaining the paramour, he complained to the vice president of Dignity Health, Mr. Vallier, and he complained specifically about nepotism, meaning the supervisor's relationship with the paramour. And the district court found that the complaint was a viable claim and that he had enough to go to a jury on the question of the discharge being in retaliation for writing that letter, but... It wasn't his complaint about to be fired that caused him to be fired. He was already fired. Well, Mr. Maynard says no, and he presented evidence that the decision to fire him was made on October 17th, which is subsequent to the letter that he sent to Mr. Vallier on October 11th. And the district court said yes, there's enough... Isn't that how you started describing when the letter was sent? The supervisor had already started the process of firing him. A supervisor had already recommended the firing, yes. But the firing did not become a done deal until the higher-ups said, yes, we're letting you go. And that was after Mr. Maynard wrote the letter. At least that's what the district court found. This is a summary judgment, right? So we have to evaluate this de novo? It doesn't really matter what the district court found, does it? That's right. This court is evaluating it de novo. But as I said, the evidence and as the court below found that there was sufficient evidence of temporal proximity between Mr. Maynard's letter and the decision of the employer to uphold the recommendation of the supervisor that Mr. Maynard be discharged. Is there any reason to think that the higher-ups were more worried about retaliating for this accusation than they were about the bad performance review and the reasons that were actually given for the termination that was already in progress? Well, Your Honor, the problem with all employment cases is that it's very hard to determine what the motives of an employer are. And that's why we draw the inferences, the courts allow the jury to draw the inferences because we just don't know. What happened was... Any discovery about how often the higher-ups change an employment decision that's already in progress? We don't have that, no, Your Honor. But of course, if this court rules on the merits that sexual favoritism of a paramour is a form of sex discrimination, then the retaliation claim is also a viable claim. Or you don't even need the claim at that point. At that point, you don't need the claim. That's correct. You know, you're down to a little under three minutes. Should we hear from the other side and then change the time? Thank you, Your Honor. Thank you. Is it Fiori? Ms. Fiori? Yes, it is, Your Honor. Good morning, Your Honors. Lindsay Fiori on behalf of Dignity Health and may it please the court. Mr. Maynard is asking this court to break from the longstanding weight of authority and hold that a supervisor who chooses to take an action to the benefit of a woman he has lived, felt a life with, lived with, owned a home with for over 20 years to the detriment of Mr. Maynard is somehow sex discrimination against him. Every federal court, as Your Honors have noted, every federal court of appeals to consider this question of paramour liability has rejected it. The EEOC has rejected it. And I want to point the court to the actual language in the EEOC's policy guidance that Mr. Maynard's counsel was discussing. There is an example in that guidance that says, Charging party alleges that she lost a promotion for which she was qualified because the coworker who obtained the promotion was engaged in a sexual relationship with the supervisor. The EEOC's investigation discloses that the relationship at issue was consensual and that the supervisor had never subjected the charging party's coworker to any unwelcome sexual advances. In this instance, the commission would find no violation of Title VII. The regulation that Mr. Maynard's counsel is referring to is a sexual harassment regulation. It is not a disparate treatment sex discrimination regulation and disparate treatment sex discrimination. Would you do me a favor and give me the citation to that EEOC frequently asked question response? Absolutely, Your Honor. It's example one of that guidance. When I printed it, it was page six. I'm not sure exactly where it shows up on the... It's under letter C in that policy guidance. There's background that just... Is that part of the record or is that a citation in your brief? It is a citation. You know, Your Honor, I'm not sure that we quoted that exact language. We have certainly cited this policy guidance in our brief. Okay. The court has asked the parties to consider whether the Supreme Court's decision in Bostock versus Clayton County had any impact or how it affects the Paramore Theory of Liability. We think that Bostock did impact this Paramore Theory of Liability, but only insofar as it solidifies Dignity Health's position in this case. Bostock didn't change the way that courts interpret or analyze Title VII. Bostock didn't create a new test for those cases. In fact, Bostock was very careful to go through sex discrimination cases, the precedent before the Supreme Court, to explain how previous opinions compelled the result in Bostock. The Bostock Court referred to the, quote, simple test, unquote, which is this. If the employee's sex had been different, would the outcome be the same? This isn't a new test. The Supreme Court was applying this test as early as 1978. The Bostock Court just took this test and applied it to a new set of facts. So the Bostock Court tells us we must ask this question in Mr. Mainer's case and as to the question of Paramore Liability. If the employee's sex, if Mr. Mainer's sex had been different, would the outcome have been the same? In Mr. Mainer's case, the answer is yes. Mr. Mainer could be a woman, but he wouldn't be Dr. Garfield's romantic partner.  Or even put a different way, an employer violates Title VII if it accepts traits or rejects traits in one sex that it would allow in another. And that test doesn't help Mr. Mainer's claim either. If the undesirable trait here is not being in a relationship with Dr. Garfield, there's no woman in the department other than Dr. Sheed who would fulfill that trait either. In your brief, you talk about the McDonnell-Douglas framework. And I didn't see any of the other circuits who have talked about this Paramore theory really engaging with the McDonnell-Douglas framework. Do you think we need to or can we just resolve this on the kinds of arguments you're making about what Title VII means and the Paramore theory? I think we can resolve it on the arguments that we're making, Your Honor. But to the extent that the Paramore theory of liability is viable, I think McDonnell-Douglas does still have a role because there still needs to be evidence presented, a question of fact, as to whether that was actually the reason for the decision. And as we've set forth in our brief, there were legitimate non-discriminatory reasons that had nothing to do with the relationship with Dr. Sheed that led to Mr. Mainer's termination. It seems like Mr. Mainer is alleging here that the only reason is this Paramore reason. So at that point, is he not similarly situated and that's all we need to say or do we really need to go through all the steps of McDonnell-Douglas? I understand your question, Your Honor, and McDonnell-Douglas may still have a role to the extent that we say are these people similarly situated outside of the fact that they're in a relationship, that one of them is in a relationship with the supervisor. Do we need to do that inquiry here? I don't really know why we would do that inquiry here. In this case, Your Honor, I don't think we need to because the theory itself is not viable as a sex discrimination theory, as a disparate treatment sex discrimination theory. And so in this case, in Mr. Mainer's case, there isn't any reason to do that. Could you address retaliation? Absolutely, Your Honor. As the district court held, because Mr. Mainer's claim for Paramore discrimination doesn't fall fairly within the purview of Title VII, he couldn't have as a matter of law engaged in protected activity. So falling fairly within means not just actually being within, but there's some sort of penumbra around it, right? Could you reasonably think that it was within Title VII? That's correct, Your Honor. And I would say that I would direct this court to your decision in the Learned case, which explains that if the conduct complained of, again, doesn't fall fairly within the purview of Title VII. If the conduct complained of is not a Title VII claim, it can't be protected activity. There can't be retaliation under that statute. That's not quite our case law or the case law in the other circuits. If a reasonable person could think that it was protected under Title VII or prohibited under Title VII, whichever way you want to look at it, and complains on that basis, even though, in fact, the behavior is not prohibited, nonetheless, that's retaliation. So there's a larger framework of what's behavior that can be complained about, and then retaliation for that complaint is protected. Your Honor, that may be the case. It is the case. So the issue then would be, is this something that a reasonable person might think is protected, and therefore, it comes within the retaliation protection? I would direct the court, Your Honor, to the actual Valier letter, which is in the record. Because what Mr. Maynard said is that the actions in favor of Dr. Shih are nepotism and that they violate the EEOC articles. You know, I would be much more comfortable adopting the government's position on no retaliation if there were some evidence that is sufficient to say that, well, the complaints didn't show up until after the decision was effectively made. Could you help me with that argument? I certainly can, Your Honor. Absolutely. The decision to terminate Mr. Maynard's employment was made on October 1st. The record reflects that, and there is some dispute over that from Mr. Maynard, of course. I would direct the court to the Valier letter, and I can provide the site for you because this is SER Supplemental Expert of Record 609. This letter refers specifically to the severance package that had already been provided or proposed to Mr. Maynard. It talks about the decision that had already been made. It's clear from the letter that he wants Dignity Health to reconsider what it has already decided, but it's also clear from the letter that the decision has already been made. To answer a question that was asked earlier, there isn't any evidence, and I don't believe the parties did any discovery, on whether Dignity Health ever, as a practice, changes its mind after already making a decision of termination and offering a severance package to an employee. Without that causation, there can be no retaliation claim, Your Honor. I hope that answers your question, but the letter itself is very clear that this decision had already been made. What's the situation again in the letter? Just a moment, Your Honor. The ER 609? Yes, Supplemental Expert of Record 609, Your Honor. Thank you. I also want to make something clear. Unless the court has any other questions for me on the retaliation claim, there is another point I'd like to make on the Paramore theory. Mr. Maynard has attempted to sort of reframe this as a sexual harassment or hostile work environment claim. He doesn't have a claim for hostile work environment or sexual harassment. He's never made those allegations. The regulation that Mr. Maynard's counsel has cited to you is about sexual harassment, and they are distinct claims. This is actually in the Bostock opinion. At page 23 of the court's opinion, it is clear that, quote, sexual harassment is conceptually distinct from sex discrimination. In a disparate treatment sex discrimination case, the question is whether the employee would have suffered the same fate if their sex had been different. This isn't a sexual harassment case, and those allegations have never been made by Mr. Maynard, and that is the difference here. He hasn't ever alleged that Dr. Shi performed sexual favors in exchange for better opportunities or that her job was saved because she submitted to sexual advances. Mr. Maynard's entire theory of liability is that Dr. Garfield preferred Dr. Shi because they were in a romantic relationship. It's a relationship that has been going on for now about 25 years. They've lived together, own a home together. There's no allegation that anything untoward happened in that relationship. It's a relationship that preexisted either Dr. Garfield's, Dr. Shi's, or Mr. Maynard's employment with Dignity Health. It's a relationship that Mr. Maynard knew about before he ever went to work for Dignity Health. Mr. Maynard has never alleged that it is anything other than a consensual relationship, and everybody agrees that it was. And the EEOC guidance I pointed the court to earlier expressly says in the case of a consensual relationship, sexual or otherwise, there is no liability. And the other thing I would point the court to is that to the extent that Mr. Maynard believes, and it appears his counsel has argued this, that the term sex in a disparate treatment sex discrimination case should include sexual relations. There isn't even any evidence in the record that Dr. Shi and Dr. Garfield had a sexual relationship. It's referred to repeatedly as a romantic relationship, and there's no evidence as to what that actually meant. Does that make a difference? I think it does, Your Honor, because if we... So you're saying that if it were a sexual relationship, Mr. Maynard would have a claim? No, I'm not saying that, Your Honor. I'm saying that if... I'm not sure that does make a difference. Well, here's what I would say. If we, if the court were to accept this theory of liability as a viable theory, I think it expands Title VII significantly. Because then we do get into these questions of what was the nature of this relationship. Everybody would agree that someone promoting their best friend wouldn't give rise to a sexual sex discrimination case. But where then do we draw that line? Do we start digging into the specifics of a relationship between two people when one of them has been promoted? That isn't what Title VII was designed to do. We're not in the business of policing or regulating employees' personal lives. And I'd like to direct the court to an example that I think really helps show what we're getting at here. Earlier this week, President Biden spoke about the Restaurant Revitalization Act. He talked about a restaurant that had 55 employees before the pandemic and is now down to seven. Imagine if one of the employees whose job was saved was the wife or husband of the owner of the restaurant. Do the 48 other employees who were laid off now all have claims for sex discrimination because the owner wanted to save the job of his wife? It's impossible to draw that line. And if we start talking about whether the relationship is just romantic or just a partnership versus whether it's sexual, we're getting into the weeds of personal lives, private lives that isn't what Title VII was intended to do. There's a reason why every federal circuit court of appeals and even the EEOC has rejected this theory. It's problematic on many bases, but most importantly, it doesn't satisfy the simple test. That is what Bostock tells us we must apply. And here, it doesn't save Mr. Maynard's claim, and it doesn't support a paramore theory of liability. Thank you, Your Honors. Okay, thank you very much. And you saved some time. Thank you, Your Honor. Now, with regard to drawing lines based on sex and sexual relationships, that is exactly what Title VII does. It says you cannot discriminate based upon sex or race or color or national origin. And when an employer says, I'm not discriminating, the courts are forced to determine exactly what has happened. And the regulation on which plaintiffs rely, 1604.11g, speaks specifically about sexual favoritism. So this is something that courts must determine and must evaluate. And I want to draw a distinction because a spouse, it doesn't talk about spouses. A spouse is a constitutionally protected liberty interest. We're not talking about a spouse here. We're talking about somebody with a romantic relationship living with his underling. And that is precisely what the title EEOC guidance— You're saying if the supervisor had married Dr. Xi, then you wouldn't have a claim? I'm saying that if the supervisor had married Dr. Xi, who, by the way, is a dentist. They talk about how she's a doctor as if she's a great researcher. She is a dentist. Whoever she is, if they were married, you wouldn't have a claim? If they were married, it would be a completely different issue. And we are not raising that issue here. And the court doesn't need to get to that issue, to the issue of marriage. Nor does the court need to get to the issue of a company with seven employees because Title VII doesn't apply. I don't understand why it makes any difference to Mr. Maynard whether Dr. Xi is married to the supervisor or not. It may or may not. To Mr. Maynard, it doesn't make a difference. He was the victim of sexual favoritism. But to the regulation and to the statute, we're not going to go so far as to say that marital status is somehow also encompassed in the regulation which says that sexual favoritism is a form of sex discrimination. And so we're saying to the court that the court can rule in favor of Mr. Maynard by the clear language of the regulation without reaching the issue of what would the court do if the parties, if the supervisor and his subordinate were married to each other. They were not, and they're not at any time. So on the notion of tabulating how many circuits have gone on one side and how many have gone on the other, all of the cases that have interpreted Section 1604.11 to permit sexual favoritism on the part of an employer can be traced back to the Dicentio decision. They all cite to the Dicentio decision and which not only do we submit is wrongfully decided, but also it predates the EEOC guidance in the letter N915.048. You've come to the end of your time if you'd like to sum up. Okay, so in sum, I would say that we are asking the court to read, to interpret Section 1604.11g exactly as it was written and to hold that when the employer denied employment benefits to Mr. Maynard and ultimately fired him after providing those same benefits to the supervisor's paramour. They were, in fact, discriminating against Mr. Maynard based upon sex. That's both based upon the regular regulation itself, the EEOC guidance interpreting that regulation, and the decision in Boston. Thank you. Okay, thank you very much. Now, before we submit, I think I'm correct that Ms. Kubitschek, you're taking this as part of our pro bono program. Is this right? Yes, Your Honor, I am. Well, I would like to thank you on behalf of the court for doing this. We find it exceedingly helpful to have lawyers like you present these arguments, these cases to us because it is of enormous benefit both to your client and, of course, to us. And you've done a very nice job with the case that you have, and we compliment you and we thank you. I would say the same nice things to you, Ms. Fiore, but you're being paid. So I thank both of you for very useful arguments. The case of Maynard v. Dignity Health is now submitted. Thank you. Thank you, Your Honor.
judges: W. Fletcher, Bea, Friedland